610 P.2d 760

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Donald R. SHEETS,
Defendant-Appellant.**

**No. 4032.**

Court of Appeals of New Mexico.

March 11, 1980.

Writ of Certiorari Denied April 9, 1980.

James L. Brandenburg, Albuquerque, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Bruce R. Kohl, Don Klein, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WOOD, Chief Judge.

■ Convicted of seven counts of selling unregistered securities, defendant appeals. Issues listed in the docketing statement, but not briefed, were abandoned. *State v. Gallegos*, 92 N.M. 336, 587 P.2d 1347 (Ct. App.1978). We (1) answer three issues summarily and discuss (2) the meaning of "security", (3) promissory notes as exempt from registration, (4) isolated transactions, and (5) instructions given and refused.

### Issues Answered Summarily

■ (a) In lieu of a statement of facts, defendant was provided the grand jury transcript in advance of trial. This was sufficient. *State v. Mosley*, 75 N.M. 348, 404 P.2d 304 (1965) and *State v. Archuleta*, 82 N.M. 378, 482 P.2d 242 (Ct.App.1970).

(b) The indictment was not legally deficient. *State v. Gurule*, 90 N.M. 87, 559 P.2d 1214 (Ct.App.1977) and *State v. Lindsey*, 81 N.M. 173, 464 P.2d 903 (Ct.App.1969), cert. denied, 398 U.S. 904, 90 S.Ct. 1692, 26 L.Ed.2d 62 (1970).

■ (c) Defendant could not have been prejudiced by the trial court's refusal to sever the seven charges. Evidence involv-ing other charges would have been admissible on each charge to negate the isolated transaction exemption, discussed hereafter. See *State v. Weisser*, 161 N.W.2d 360 (N.D. 1968). The trial court did not abuse its discretion in denying the motion to sever. *State v. McGill*, 89 N.M. 631, 556 P.2d 39 (Ct.App.1976).

### The Meaning of "Security"

The evidence as to six of the seven charges is that the person furnishing money to defendant would receive in return an instrument entitled "promissory note". The note did not reflect the amount of money furnished to defendant and did not state that any interest was to be paid. Rather, the note would recite an amount to be returned to the person furnishing the money. According to the briefs, the difference between the money furnished and the money to be returned amounted to 36 percent "interest" over the life of the note. The evidence in the count involving Avery is illustrative. Avery supplied $2,000 to defendant. The note that defendant gave in return promised to pay to Avery, or his order, a "loan principal" of $3,280. This "principal" was to be paid in 21 monthly installments. The first 2 monthly payments were to be in the amount of $100, the next 18 monthly payments were to be in the amount of $60, and the 21st payment was to be for $2,000.

Defendant's transaction with Gold was shown by a written "agreement". This document recites that Gold "hereby invests" $13,000 with defendant, that defendant is to invest this sum at his discretion, that defendant is to pay Gold a monthly sum equal to the earnings received by defendant from the investment. The document authorizes defendant to deduct a reasonable profit for himself at defendant's "sole discretion". However on or before one year from the date of the agreement, defendant is to return the $13,000 investment to Gold, "together with undistributed earnings".

Defendant contends that none of the seven transactions came within the meaning of "security". He asserts that "security" was

intended to apply only to investments and none of the transactions were investments. He claims an investment requires profit sharing and only the Gold transaction involved profit sharing. He claims an investment requires some risk taking and inasmuch as there was an unconditional promise to pay in each instance, the risk element was lacking. He claims an investment refers to a transaction in which stock is often issued and none of the seven transactions were of that type. He claims that each of the seven transactions were commercial notes which were not intended to be considered a "security". He also claims that not to agree with these arguments would be a perversion of our Securities Act and "create unmanageable congestion and arbitrary administration" in the registration of securities.

Most of defendant's arguments bottom on the view that to be a "security", the instrument involved must be an "investment" of the type that involves profit sharing or risk. This ignores New Mexico's definition of "security". Section 58–13–2(H), N.M.S.A.1978 states:

> H. "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in oil, gas or other mineral rights, collateral trust certificate, preorganization certification [certificate] or subscription, transferable shares, investment contract, voting-trust certificate or beneficial interest in title to property, profits or earnings, or any other instrument commonly known as a security, including any guarantee of, temporary or interim certificate of interest or participation in, or warrant or right to subscribe to, convert into a [or] purchase any of these. "Certificate of interest in oil, gas or other mineral rights" does not mean oil royalties[.]

 Defendant does not concern himself with the broad scope of this definition; his approach is that the federal statutory definition of security has been given a narrow application and a similar narrow appli-

cation should be given to the New Mexico definition. Defendant's approach is incorrect. "Congress did not intend to adopt a narrow or restrictive concept of security in defining that term." *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Defendant's approach also ignores the New Mexico rules that (1) in the absence of ambiguity, statutes are to be given effect as written, *State v. Elliott*, 89 N.M. 756, 557 P.2d 1105 (1977); and (2) statutory words are to be given their usual, ordinary meaning absent a clearly expressed legislative intent requiring otherwise, *Tafoya v. New Mexico State Police Board*, 81 N.M. 710, 472 P.2d 973 (1970). There is no ambiguity in the statutory words "note" and "evidence of indebtedness"; their usual, ordinary meanings apply because there is no legislative intent to the contrary. The documents issued by defendant were notes and were evidence of indebtedness; they were securities as defined by § 58–13–2(H), supra.

In urging adoption of a narrow meaning to "security", defendant points out that the definitions of security in the federal statutes,[1] 15 U.S.C. §§ 77b(1) and 78c(a)(10) (1971) are similar to the definition in § 58–13–2(H), supra. We agree there are similarities, but there is also an important difference to which we will refer later.

Defendant cites *Securities and Exchange Com'n v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) as holding that the test for a security "is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." The quoted phrase does not purport to be a test for "security"; rather, the quoted phrase pertains only to "investment contract", which is only one of the meanings of "security". *Howey*, supra, recognizes that a statutory definition of "security" is inclusive rather than exclusive; *Howey*, supra, was concerned with only one part of the inclusive definition.

---

1. The Securities Act of 1933 and the Securities Exchange Act of 1934.

Defendant cites *Securities & E. Com'n v. C. M. Joiner L. Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) as holding that the test for security "is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." Again, defendant has taken the quoted phrase out of context. The quoted phrase refers to investment contracts. More appropriate to this case, *Joiner* states:

> In the Securities Act the term "security" was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as "transferable share," "investment contract," and "in general any interest or instrument commonly known as a security." We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents. *Instruments may be included within any of these definitions, as matter of law, if on their face they answer to the name or description.* [Our emphasis.]

Notwithstanding the recognition in *Joiner*, supra, of the variety of instruments coming within the statutory definition of "security", defendant relies on a law review article which argued that ordinary commercial notes were not securities under the Securities Exchange Act of 1934. Abrahams, *Commercial Notes and Definition of "Security" Under Securities Exchange Act of 1934: A Note is a Note is a Note?*, 52 Neb.L.Rev. 478 at 486 (1973) states: "The position taken by this article, that ordinary commercial notes are not securities, essentially is based on the premise that the context *does* require non-security treatment for such notes." This position is based on an important difference between the federal and the New Mexico statutes. Compare *State v. Barela*, 93 N.M. 700, 604 P.2d 838 (Ct.App.1979).

Both federal statutes define "security" similarly to the New Mexico definition "unless the context otherwise requires". See 15 U.S.C. §§ 77b and 78c, supra. The New Mexico statute, § 58–13–2(H), supra, does not contain the "context" clause. Because of this statutory difference, the Nebraska Law Review article does not support defendant's contention that "security" in our statute excludes commercial notes.

A distinction between commercial and investment notes was made in *Zabriskie v. Lewis*, 507 F.2d 546 (10th Cir. 1974). Explaining why the distinction was made, the opinion states:

> A more difficult question is raised by appellants' assertion that these notes are not within the definition of *security* because they are not the type of notes Congress intended federal securities law to regulate. Appellee admits that not all notes are meant to be reached by the federal securities law. Although this statement seems to be contrary to the clear language "any note", the "unless the context otherwise requires" language of 15 U.S.C. §§ 77b and 78c(a) and the Supreme Court's indication that we are dealing with a flexible concept, *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), have been held to compel limitation concerning notes to be considered within the definition. . . Thus, not all notes are included within the protection of the anti-fraud provisions.

Because the distinction was based on "context" language not a part of the New Mexico statute, *Zabriskie*, supra, does not support defendant's claim that notes are not a "security" unless an investment, as opposed to a commercial note. See also *State v. Hoephner*, 574 P.2d 1079 (Okl.Cr.1978).

A further answer to defendant's argument that commercial notes do not come within the statutory definition of security, is that § 58–13–29(H), N.M.S.A.1978 (1979 Cum.Supp.) provides that certain commercial paper is exempt from registration. Un-

less the commercial paper came within the statutory definition of security, there would be no need for the exemption.

■ Our statutory definition of "security" does not require "profit" or "profit sharing" as a test of what is a security. See *Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). Nor is risk an essential ingredient of the statutory meaning of security. The Nebraska Law Review article, supra, page 514 explains:

> [R]isk is essentially a function of the financial standing of the obligor, rather than necessarily being a function of the transaction itself. Many instruments which are clearly securities are virtually riskless . . . . For example, debentures offered publicly by an old, well-established, "blue-chip" corporation hardly should be characterized as securities by virtue of the risk involved in their purchase: such risk is probably non-existent, but the debentures would be securities nonetheless.

Similarly, the New Mexico definition of security does not require a transaction in which stock is often issued.

We reject defendant's contention that an instrument may not be a "security" unless it can somehow be fitted into defendant's specialized view of investment. We also reject the contention that the New Mexico definition of "security" does not include commercial notes. Any instrument coming within the statutory definition is a security; the notes and the agreement with Gold were securities. This holding does not pervert the act, rather, it gives effect to the legislative enactment. Finally, there is nothing in the record indicating administrative chaos would result from giving effect to the statutory language. See the provisions for exempt securities and exempt transactions. Sections 58–13–29, supra, and 58–13–30, N.M.S.A.1978.

*Promissory Notes as Exempt from Registration*

This issue involves § 58–13–29(H), supra, which exempts from registration:

> H. any commercial paper which arises out of a current transaction or the proceeds of which have been, or are to be, used for current transactions, and which evidences an obligation to pay cash within nine months of the date of issuance, exclusive of days of grace, or any renewal of such paper which is likewise limited, or any guarantee of such paper or of any such renewal[.]

In discussing the meaning of this exemption, the parties reverse the approach taken in discussing the meaning of "security". Having urged a broad meaning of security to include commercial notes, the State asserts the exemption for "commercial paper" has a narrow meaning. Having argued a narrow meaning of security to exclude commercial notes, defendant contends that "commercial paper", in the exemption, has a broad meaning. We held that any instrument coming within the statutory definition was a "security"; here we must consider the meaning of "commercial paper" because those words are not defined in the Securities Act.

In contending that commercial notes did not come within the meaning of "security", defendant relied on federal decisions. In urging that "commercial paper" be defined narrowly, it is the State that relies on federal decisions. We did not follow the federal decisions that excluded commercial notes from the definition of "security", nor do we follow federal decisions that narrow the commercial paper exemption by limiting the exemptions to only certain types of commercial paper.

■ We did not follow federal decisions excluding commercial notes from "security" because of differences in the wording of federal and New Mexico statutes. We do not follow the federal decisions limiting the commercial paper exemption to only certain types of commercial paper because that limitation departs from the ordinary meaning of commercial paper.

7A U.L.A., Uniform Securities Act (1978) page 565 states that New Mexico's Securities Act was a "substantial adoption" of many provisions of the Uniform Securities

Act. Section 58–13–29(H), supra, is identical to § 402(a)(10) of the Uniform Securities Act. 7A U.L.A., supra, page 640. This exemption, in the Uniform Securities Act was based on § 3(a)(3) of the Securities Act of 1933, which is codified as 15 U.S.C. § 77c(a)(3). See 7A U.L.A., supra, page 644. The federal provision is similar, however, it does not use the words "commercial paper"; the federal provision uses the words "note, draft, bill of exchange, or banker's acceptance".

"Commercial paper" is also not defined in New Mexico's version of the Uniform Commercial Code. See §§ 55–1–201 and 55–3–102, N.M.S.A.1978. However, Article 3 of the U.C.C. is headed "Commercial Paper" and § 55–3–101, N.M.S.A.1978 states the article may be cited as "Uniform Commercial Code—Commercial Paper." Types of paper referred to within the "commercial paper" article are "draft", "check", "certificate of deposit" and "note." Section 55–3–104, N.M.S.A.1978. The similarity between the type of paper included within the "commercial paper" exemption to the Securities Act of 1933 and the type of paper referred to in the "commercial paper" article of the U.C.C. is apparent.

Concerning the meaning of "commercial paper", in the Federal Bankruptcy Act under consideration, *In re Nickodemus*, 18 Fed.Cas. 222 states that:

[C]ommercial paper is used in the bankrupt act to denote bills of exchange, promissory notes, and negotiable bank checks; paper governed by those rules which have their origin, and are established upon the custom of merchants in their commercial transactions, known as the law merchant. Such paper is usually denominated commercial paper, and we must presume congress used the term in its common acceptation, rather than in a more restricted sense.

Whether "commercial" was a limiting adjective, was discussed in *In re Chandler*, 5 Fed.Cas. 447 (1870). The judge stated:

While . . . I agree with the defendant that commercial means mercantile,

and that merchandise means pertaining to trade, yet I can by no means adopt the conclusion that the particular bill or note must be in any way connected with commerce or trade, but rather that it must be of that class which commerce introduced and still deals in.

Thus, "commercial paper" is descriptive of the kind of paper and not of the mode in which it was issued or used in a particular situation.

Our discussion has indicated what is included within the meaning of "commercial paper". We do not, however, attempt a specific definition because it is unnecessary to do so. Defendant asserts that the documents he issued were promissory notes; we accept that characterization. Promissory notes come within the meaning of "commercial paper". *Bank of Newport v. Cook*, 60 Ark. 288, 30 S.W. 35, 46 Am.St.Rep. 171 (1895); compare *County Board of Education v. Taxpayers and Citizens*, 276 Ala. 472, 163 So.2d 629 (1964); *Royal Jewelers v. Tanner*, 95 Ohio App. 339, 108 N.E.2d 291 (1952).

The State does not contend that notes, drafts and similar documents do not come within the meaning of "commercial paper", and does not contend that the promissory notes issued by defendant were not "commercial paper" in the ordinary meaning of those words. The State does contend that such an ordinary meaning does not apply; that "commercial paper" has a special meaning. The special meaning, according to the State, would restrict "commercial paper" to (a) prime quality negotiable commercial paper (b) of a type not ordinarily purchased by the general public (c) which is used to facilitate recognized types of current operational business requirements and (d) a type of paper eligible for discounting by federal reserve banks. This was the approach taken in *Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075 (7th Cir. 1972); see also *People v. Dempster*, 396 Mich. 700, 242 N.W.2d 381 (1976).

In adopting a special meaning for "commercial paper", *Sanders,* supra, and

*Dempster*, supra, followed the interpretation of the Securities and Exchange Commission. Release 33–4412, 26 Fed.Reg. 9158 (1961). The Securities and Exchange Commission interpretation was based on federal legislative history. See I Loss, Securities Regulation (2d ed. 1961) pages 566–67; IV Loss, Securities Regulation (Supp. to 2d ed. 1969) page 2590; *Anderson v. Francis I. duPont & Co.*, 291 F.Supp. 705 (D.Minn. 1968). We have no such legislative history in New Mexico. There being nothing indicating the New Mexico Legislature intended a special meaning for "commercial paper", the ordinary meaning of "commercial paper" applies. *Tafoya v. New Mexico State Police Board*, supra.

Defendant seems to argue that "commercial paper" in § 58–13–29(H), supra, *must* be given the same meaning as "commercial paper" under the New Mexico U.C.C. This contention is the predicate for defendant's suggestion that "security" in § 58–13–2(H), supra, has the same meaning as "security" in § 55–8–102, N.M.S.A.1978, a part of our U.C.C. The reason for this contention is that defendant's promissory notes do not come within the definition of "security" in § 55–8–102, supra.

Defendant's argument that "security" in the Securities Act should be given the meaning of "security" in the U.C.C. is frivolous. Both acts define "security". The definition of "security" in the Securities Act, § 58–13–2(H), supra, applies when the question is the sale of unregistered securities; the different definition in § 55–8–102, supra, is not applicable.

We reject the contention that "commercial paper" in § 58–13–29(H), supra, has a meaning identical to commercial paper under New Mexico's U.C.C. A document might be commercial paper under both acts. However the purposes of the two acts are not the same. Two purposes of the U.C.C. are "(a) to simplify, clarify and modernize the law governing commercial transactions;" and "(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties". Section 55–1–102, N.M.S.A.1978. A

purpose of our Securities Act, applicable in this case, is to prevent the sale of unregistered securities. *People v. Dempster*, supra. With the differences in purpose, we cannot say that "commercial paper" *must* have the same meaning in both acts.

■ Although defendant's promissory notes were commercial paper, were they obligations to pay cash within nine months of the date of issuance? The similar federal act, 15 U.S.C. § 77c(a)(3) (1971) does not use the words "pay cash within nine months of the date of issuance". The federal wording is "maturity at the time of issuance of not exceeding nine months". Because of the different wording in the federal statute, we do not look to "maturity" decisions for guidance. The New Mexico Legislature, in using the words "pay cash", intended that the obligation be paid in full. We hold that the obligation to pay cash within nine months of the date of issuance means an obligation for payment in full within nine months of the date of issuance. None of the notes issued by defendant were to be paid in full within nine months of issuance.

Although defendant's promissory notes were commercial paper within the meaning of § 58–13–29(H), supra, defendant was not entitled to the exemption because the notes were not to be paid in full within nine months of issuance. So holding, it is unnecessary to consider the meaning of "current transaction" in § 58–13–29(H), supra.

*Isolated Transaction*

Generally speaking, § 58–13–30(A), supra, exempts from the Securities Act "any isolated transaction, whether effected through a broker-dealer or not". Defendant claims the promissory notes he issued were isolated transactions and, therefore, exempt from the Securities Act.

■ Defendant asserts that his transactions were "isolated" because there was no public offering. Seemingly, he cites § 402(b)(9) of the Uniform Securities Act as support for this contention. It is difficult to believe that this citation was made seriously. Section 402(b)(9), supra, pertains to offers directed to not more than ten persons

during any period of twelve consecutive months. 7A U.L.A., supra, page 641. New Mexico did not enact this provision. Section 402(b)(9), supra, provides no support for defendant.

In claiming a "public offering" exemption, defendant cites *People v. Humphreys*, 4 Cal.App.3d 693, 84 Cal.Rptr. 496 (1970). *Humphreys* dealt with a "public offering" exemption which was a part of the California statute. New Mexico did not enact such an exemption; the isolated transaction exemption does not depend on whether the offering was public. *Anderson v. Mikel Drilling Company*, 257 Minn. 487, 102 N.W.2d 293 (1960) discusses the difference between a "public offering" and an "isolated transaction" exemption and points out that the two exemptions are based on different considerations.

Defendant also contends that his transactions were isolated because "there was no connection between any of them or any other transaction. They all occurred over a wide period of time and demonstrate the type of transaction that should not be subject to . . . registration . . . ."

Defendant's argument presents a question as to the meaning of "isolated", which is not defined in our Securities Act. Not being defined in the statutes, isolated is to be given its ordinary meaning. *Tafoya v. New Mexico State Police Board*, supra. An ordinary meaning of "isolated" is " 'unique; occurring alone or once; sporadic, not likely to recur.' " *Besser Company v. Bureau of Revenue*, 74 N.M. 377, 394 P.2d 141 (1964).

As to the count involving Hunt, defendant issued one promissory note on January 20, 1978 and a second on January 31, 1978. As to the count involving Gold, defendant executed the "agreement" on August 9, 1977. Gold testified this was his third annual investment, the first having occurred in 1975. As to the count involving Fergesen, defendant issues one promissory note on May 25, 1976 and a second on April 19, 1977. As to the count involving Clevenger, defendant issued one promissory note on October 10, 1975 and a second on May 1, 1976. As to the count involving Avery, defendant

issued his promissory note on December 21, 1977. As to the count involving Scanland, defendant issued one promissory note on September 2, 1977 and a second on October 7, 1977. As to the count involving Kear, defendant issued one promissory note on November 3, 1975, a second on March 24, 1976, a third on June 21, 1976 and a fourth on August 9, 1976. In addition, there is evidence that defendant issued promissory notes to Goehring on December 20, 1975, February 18, 1976, April 22, 1976 and January 6, 1977.

■ Considering the dates involved, and the repetitive issuance of promissory notes, none of the seven counts involved an isolated transaction and the exemption for an isolated transaction did not apply. *Kneeland v. Emerton*, 280 Mass. 371, 183 N.E. 155 (1932); *Gales v. Weldon*, 282 S.W.2d 522 (Mo.1955); *Nelson v. State*, 355 P.2d 413 (Okl.Cr.1960); *Tarsia v. Nick's Laundry & Linen Supply Co.*, 239 Or. 562, 399 P.2d 28 (1965); *Commonwealth v. Summons*, 157 Pa.Super. 95, 41 A.2d 697 (1945).

*Instructions—Given and Refused*

■ (a) The prosecution stipulated that defendant had no specific intent to sell, or offer for sale, a security when executing the promissory notes. On the basis of the stipulation, defendant asserts the case should not have been submitted to the jury. We disagree; the sale of unregistered securities is not a specific intent crime. *United States v. Hill*, 298 F.Supp. 1221 (D.Conn. 1969).

(b) The trial court's instruction on intent was U.J.I. Crim. 1.50. That instruction states: "A person acts intentionally when he purposely does an act which the law declares to be a crime, *even though he may not know that his act is unlawful.*" (Emphasis added.) Defendant requested an instruction that would have changed the emphasized words to read: " 'A person acts intentionally when he purposely does an act which the law declares to be a crime *with a sense of conscious wrong-doing.*' " (Emphasis added.) Defendant contends that U.J.I.

Crim. 1.50 is an incorrect instruction on criminal intent because it does not refer to conscious wrongdoing.

There are two answers to this contention. First, U.J.I. Crim. 1.50 is a mandatory instruction adopted by the Supreme Court for use in all cases except no intent crimes, first and second degree murder and voluntary manslaughter. Use Note to U.J.I. Crim. 1.50. This Court has no authority to overrule instructions approved by the Supreme Court. *State v. Scott*, 90 N.M. 256, 561 P.2d 1349 (Ct.App.1977).

Second U.J.I. Crim. 1.50 is an instruction on general criminal intent and the instruction sufficiently covers conscious wrongdoing in the words "purposely does an act which the law declares to be a crime". A separate reference to conscious wrongdoing was not required.

(c) Section 58–13–4, N.M.S.A. 1978 declares it to be a felony "to offer or sell any security in this state, except securities exempted or securities sold in transactions exempted, unless the security is registered . . . ." Section 58–13–43, N.M. S.A.1978 provides penalties for a willful violation of § 58–13–4, supra.

The jury was instructed that the sale of unregistered securities must have been willful. Thus, defendant's indirect contention, that the jury was not instructed concerning willful violations, is incorrect. If defendant is claiming that willfulness is not defined, the answer is that defendant did not request that a definition instruction be given. *State v. Padilla*, 90 N.M. 481, 565 P.2d 352 (Ct.App.1977).

Inasmuch as U.J.I. Crim. 1.50, the instruction on general intent, was given there was no need for an instruction on willfulness. To meet the willfulness requirement, all that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing. See 7A U.L.A., supra, Commissioners' Note at pages 591 and 665: *State v. Hodge*, 204 Kan. 98, 460 P.2d 596 (1969); *State v. Russell*, 119 N.J.Super. 344, 291 A.2d 583 (1972). U.J.I. Crim. 1.50 covers willfulness in the words "purposely does an act".

(d) Defendant complains of the refusal of several requested instructions which he identifies by numbers. We are unable to find these requested instructions in the appellate record, nor can we find a reference to them at the conference at which the trial court settled the instructions. See R.Crim. Proc. 41(b). The State's brief assumes defendant did request the refused instructions. Both parties urge a decision on the merits of these purported requests. We decide the merits of the purported request to meet defendant's misconceptions.

According to defendant, these refused instructions contained the language: " 'The Defendant knew that the note, investment contract, or evidence of indebtedness was a security.' " Defendant contends that in order to commit the offense of selling an unregistered security he must have knowledge that the item sold was in fact a security. Defendant refers us to § 58–13–43(A), supra, which does require knowledge of a rule or order of the chief of the securities bureau before one can be convicted of willfully violating such rule or order. A reason for requiring knowledge of a rule or order is that administrative rules and orders are not always easy to find. *State v. Hodge*, supra. However, the wording of § 58–13–43(A), supra, shows that knowledge that the item is a security is not a requisite for a conviction for violating § 58–13–4, supra. The instructions, if requested, were properly refused.

(e) The trial court gave several instructions to the effect that fact situations stated in the instructions were indications of whether a particular document was or was not a security. We give two examples. Instruction No. 14 stated:

If repayment of the loan does not depend upon the success of the enterprise and repayment is to be made regardless of the success or failure of the enterprise, this is an indication that the note is not a security.

Instruction No. 16 stated:

If the lendor does not retain any rights or control over the money loaned, this is indication that the note is not a security.

These instructions were based on federal decisions; see *Zabriskie v. Lewis*, supra, that all notes are not securities under federal securities statutes. This federal view is not New Mexico law. See the discussion in this opinion of the meaning of "security". The instructions were incorrect under New Mexico law and should not have been given. Since these instructions improperly favored the defense, defendant does not complain about the ones given.

Defendant does complain of the trial court's refusal to give two instructions of a similar nature.

The trial court properly refused the requested instruction which read: " 'In determining whether a note is a security, consideration should be given to whether the parties considered the note a security or a commercial transaction.' " Refusal was proper because § 58–13–2(H), supra, defines "any note" as a security. What the parties considered is not relevant to the statutory definition.

 The trial court properly refused a requested instruction which read: " 'You are instructed that if the transaction is one in which stock is usually not given, this is an indication that the note is not a security.' " Refusal was proper because the statute does not define security in terms of the issuance of stock.

The judgment and sentences are affirmed.

IT IS SO ORDERED.

HERNANDEZ and LOPEZ, JJ., concur.